When the case is called with the attorneys who are going to orally argue, please come up to the podium and introduce yourselves. Please call the next case. Okay, the attorneys for the appellant. Good morning, your honor. Carrie Maloney Layton for the city of Chicago. Is anyone else going to orally argue for the appellant? Very well. Appellee. Your honor, John Klein for the appellees who were known below as the Durkin defendants. The Durkin defendants, yes. And Sarah Gelsomino, G-E-L-S-O-M-I-N-O, for the NLG defendants, the remainder of the defendants. Attorneys for the appellee, you're going to have to apportion your time accordingly. Both sides will be given one half hour to argue. Appellant, you're going to have to budget from your time whatever portion you'd like to have for your rebuttal. Okay? Thank you. Very good. We'll proceed with the appellant. Good morning, your honors. May it please the court. Your honors, in this case the city prosecuted defendants for violating the park district's ordinance which closes all city parks overnight between the hours of 11 p.m. and 6 a.m. This ordinance regulates conduct being present in city parks without regard to any content of expression. It's therefore a content neutral regulation with only an incidental effect on expression. For purposes of the argument this morning, I believe it would assist the court for me briefly to set out what is no longer in dispute before turning to the issues that are. The circuit court dismissed the prosecutions in this case both because it believed the ordinance violated the constitution on its face and as applied and also because it believed defendants had proved their selective enforcement defense. With respect to the facial invalidation, we explained in our opening brief that that ruling was incorrect. The defendants did not take issue with our arguments in their response brief. We therefore submit that this court should definitely reverse the ruling on facial invalidation. Facial invalidation is strong medicine that requires either the ordinance to be unconstitutional in every application or to be substantially over broad. But because the ordinance affects more people that are not present in the park for purposes of expression, but instead are there for non-expressive purposes, it cannot possibly violate the constitution in every conceivable application or in a substantially over broad number of applications. So leaving aside, if there are no other questions about facial invalidation, I would leave that aside and move on to the other rulings, which are the ruling that the ordinance is unconstitutional as applied to these 90 defendants' conduct and also that these defendants had proved on their motion papers their selective enforcement defense. With respect to the as applied challenge, there are also areas of agreement here. There is no dispute that intermediate scrutiny is the appropriate scrutiny and there's also no dispute that one element of that intermediate scrutiny has been satisfied, namely that there are in fact substantial governmental interests served by the Park District Ordinance. Those interests are addressing the time period, the middle of the night when there is the most risk for crime against the public and against park property. Also giving the parks time to daily reprieve, which serves the interest in conserving parks for future generations, and also providing a window of opportunity for the park to perform maintenance and beautification, which makes the parks beautiful for current people that wish to use the parks. There isn't any dispute from the circuit court or defendants that those are substantial. What is in dispute are the other two elements of the as applied test, and that is whether there is a close enough fit or narrow tailoring between the substantial interests and the regulation, and also whether there are adequate alternatives available to these 90 defendants. We explain in our motion, in our brief, that O'Brien, the test, which applies to regulations of conduct with only an incidental effect on expression, is more conceptually appropriate because this is a regulation of conduct. However, the time, place, and manner test, according to Supreme Court precedent, is largely the same. There's no distinction that's meaningful in terms of the elements. And so both of those tests could be used to look at this particular case. So turning to, first, the narrow tailoring question. May I just ask, what was the circuit court's basis upon which it determined the unconstitutionality? Well, it determined the unconstitutionality primarily what appeared to be based on a facial invalidation on an over-breath theory. Did the court state the factors upon which it reached that conclusion? It was looking to whether the factors that it looked to were whether conduct of other, the expression of other people not before the court would be affected. So it was speculating about other nighttime rallies, large gatherings that might not be able to use the parks overnight, and that might not have anywhere else to go. But on an as-applied challenge, that was not appropriate. The questions on the as-applied challenge are with respect to these 90 defendants. And on narrow tailoring, it's whether the ordinance restricts substantially more speech than necessary to serve the governmental interest would be served less effectively without the regulation in place. It's not enough just to posit a less restrictive alternative. The Supreme Court cases teach us that the least restrictive means is not required and that the government may select among alternatives and choose the one that it believes fits the best so long as it's not restricting substantially more speech than necessary. And as applied to this case, the time period when the restriction is in place is the time of day when the fewest people wish to use the park. That includes the general public, but also that includes people who are protesting in particular because those people in general hope to reach others with their message and that's just the time of day when most people are not around. So imposing the regulation at that time of day cannot restrict substantially more speech than necessary to serve the interest. Moreover, that's the time of day where one of our interests is the preventing access to the parks at the time of day that are most at risk for crime. So that's served exactly by closing the parks during those particular hours. Ms. Maloney-Glayton, did Mr. Williams also testify to the prevention of crime in addition to the beautification of the park? Yes. That's in paragraph four of his affidavit. He does mention that as one of the three elements, including maintenance and beautification and preserving the parks for future generations and also the interest in protecting public and park property from the crime, which is most heavily overnight. Can you just explain briefly why the court rejected his affidavit? I'm sure, Your Honor. The court believed that he had not set forth enough facts that would establish the park district's need for maintenance to fill all seven hours. However, that was, we submit the wrong question. It not only addressed one of the governmental interests at stake. It didn't address the interest in crime or leaving the parks, you know, giving them a daily reprieve from use. But also it was seeking out the least restrictive means. And we know from Ward, among other cases, that's not required. It's not a question whether the interest would also be served by fewer hours. And in fact, in the Supreme Court decision in Clark, the Supreme Court, that case actually addressed park conservation in particular. And the court made very plain that it was not up to the judiciary to second guess what the park managers were doing with respect to what the park district's needs were and with respect to what ends would serve those needs. But the circuit court seemed to ignore that and seemed to doubt that the park district official could competently testify regarding what the park district needs were. But he, in his affidavit, explained that as part of his regular duties, it's part of his regular duties to be aware of these things. And accordingly, he was knowledgeable about what the interest were of the park district and also what practices were necessary. I want to just briefly mention that in their defendant's briefs in this court, they seem to rely on cases that predate the Ward decision and that speak in terms of least restrictive means. So they say things like, if there's another alternative that could serve or, you know, things could be done with less time, that's not appropriate. The regulation is constitutional if it doesn't restrict substantially more speech than necessary and if the government interest would be served less effectively without it. And we know from Clark that, Clark says, if parks would be more exposed to harm without the prohibition than with it, the ban is safe from invalidation under the First Amendment. And we know in this case that the interest absolutely in crime overnight would not be served at all by moving the time period to a different, the time period would not be served. We also know that more people would be impacted if parks were closed at a different time instead of in the middle of the night. And these suspended don't seriously dispute that the parks need to be closed at least for some time period. They seem to take issue with the number, but that's going for least restrictive means. Finally... Were these the only two nights that the arrests... Yes, Your Honor. There were... Did the Occupy group camp out at the park at other nights? No, Your Honor. So was this a prearranged date, these two dates, that they decided on this date and that date, October 16th and October 21st or 2nd? These are the two nights we will go to the park and stay there as long as we can? I believe so, Your Honor, but I would allow them to speak to that more knowledgeably. My understanding is that they were protesting without interruption, 24-7, at the intersection of LaSalle and Jackson. The police allowed them to be there overnight, all hours of the day. But on the night of October 15th, they wanted to go over to Grant Park. And the police allowed them to march from Jackson and LaSalle through the loop to Grant Park. And they were allowed to protest there up until the time the park closed, at which point they were told the park is closed. They were given another two hours to comply with the ordinance. And it was only then, when they refused to leave, these particular defendants, 90 of them refused to leave, that they were arrested. And then, I believe a week later, the same thing played out. Counsel, what about the argument raised by defendants that there were other provisions and statutes that addressed preservation, maintenance, littering, et cetera, that aren't necessarily contained in this particular code? That would also address the preservation of the park without having a complete ban during those hours? I have several responses to that, Your Honor. First, that doesn't address all the interests. One of the interests is that the hours between 11 and 6 are the most fraught with risk for crime. And so you can use other ordinances, but if you let people in the park overnight, you're going to increase the risk that they will be exposed to crime, that will attract criminals, and that the parks, that the public and the park district property will be subjected to crime. So it doesn't address all the interests to begin with, but also we cite cases, including initiative and referendum decision, in which the court has explained that just because a different alternative would also be permissible, doesn't mean that the alternative in question is impermissible. And that makes sense. These defendants want an exception that would allow their particular conduct. But if you make an exception, a different kind of exception, there would be other people subjected to that who also would want an exception. So the government is free to choose among different ways of addressing the problem. And so long as substantially more speech is not impacted, which we submit cannot be the case here when the parks, fewest people want to use the parks during these hours, as long as substantially more speech is not impacted, the government is allowed to select the method that it believes best serves the interest. One other point on narrow tailoring, and that is that the test is not whether these particular defendants want, would have, you know, an exception for them. Would harm the governmental interest at stake, the Supreme Court's decisions in Albertini and Clark and Heffron, among other cases, make clear that for narrow tailoring purposes, you have to look at not just the defendants before the court, but everyone who would be entitled to avoid the regulation if it weren't in place. And that's because no particular person has a special claim to First Amendment entitlement. So everyone in a like position to these defendants who would not be allowed, excuse me, who would be allowed to use the park, the cumulative effect of their conduct must be weighed in assessing whether there's a tight enough fit between the governmental interest and the regulation. So is that another way of saying that if the city had allowed the Occupy group to stay in Grand Park these two nights, they would have been able to use the park? No, they would have had to have opened up all the Chicago parks for those two nights and make it open for crime, lack of maintenance, beautification, use throughout the city just for these two groups. Right, and in addition, it's not just these two groups, it's any First Amendment actor that would want to use the park during the overnight hours. Or not. Or not. Correct, correct, Your Honor. Boat dealers, criminals. Right. Anybody would have been allowed to walk through any park in the city of Chicago because the ordinance wouldn't have been in effect for them either. Right. Is that correct? If the government is not allowed to enforce the ordinance against these people, then it couldn't enforce it against others who are in a similar situation. Now, we might have been able to enforce it against, if it's so long as it's not facially unconstitutional. We could enforce it against people like the drug dealers or the people that are not there for expressive purposes, but these people are not the only people that want to express themselves for First Amendment purposes, so we have to weigh not just what their harm, conduct would harm, whether they're on the concrete or grass, there would be other people who would want to use the parks too that we couldn't keep away, and that would impede the ability of the park district to meet its interest in eliminating the havens for crime. And beautifying the parks and conserving them. Now, for ample alternatives, again, this is an as-applied challenge. There are 90 defendants here, and the question is whether there was an adequate place for them to go. And the case is established that the alternative doesn't have to be the first or best choice. It doesn't even have to permit reaching the same audience. In this case, there were a number of alternatives for these defendants. They could have returned to Jackson and LaSalle, which they have explained is the primary focus of their message. The financial institutions that are there represent the 1%. That's where they were protesting 24 hours a day. They could have gone back. They also could have moved across the street. Hundreds of other people who were at the same rally in Grant Park as they were, who were there after the park was closed. So once they complied with the ordinance and went out across the street, they could have gone back. They could have moved across the street onto the sidewalk. They were allowed to continue protesting. These defendants, these 90 defendants, also could have fit on the city of Chicago's sidewalks. These defendants also don't have any special reason to access Grant Park, which distinguishes the other cases in which the forum that was in dispute, there was a special reason that the particular people wanted to be there. In this case, they've expressed how important Jackson and LaSalle is to their message, and they've expressed nothing about Grant Park. The best they could come up with is they wanted to be close to Michigan Avenue and reach the people, the itinerants who might be there in the middle of the night. And we submit in response simply that if that was the audience they hoped to reach, then it would be even better for them to leave the park at 11 p.m. and go out onto the sidewalk where other people from their movement were present to reach the people on Michigan Avenue they hoped to reach. Again, if the ordinance is not facially invalid, the park can be closed to everyone else. So the parks are going to be empty. The people that want to use Grant Park, there are not many people in Grant Park in the middle of the night to reach. The audience for their message was found elsewhere. Before turning on to the selective enforcement claim, I just want to briefly point out that the Circuit Court also held the ordinance violated the Illinois Constitution. And with respect to that issue, we would rest on our briefs. I wanted to point out that there is no reason that there is a different test under the Illinois Constitution with respect to protected expression. The test under the First Amendment for intermediate scrutiny is also the test under the Illinois Constitution and defendants in the Circuit Court have not even bothered to try to explain why there should be a stricter scrutiny under Illinois Constitution. So that claim should rise or fall with the First Amendment claim. On the selective enforcement claim, I want to just briefly explain the procedural posture again of this case. It was defendants who moved to dismiss these prosecutions. They had the burden of proof to raise an affirmative defense of selective prosecution and to support it with evidence. The Circuit Court incorrectly held on their motion to dismiss that they had proved their selective enforcement defense. And they were missing evidence on all the prongs of their defense. And that is a required case. Those prongs are they have to show similarly situated others receive better treatment and they had to show evidence, not just that they were arrested because of their conduct, but because of their message. We cite cases that make claim that it's not unconstitutional to prosecute selectively for whatever reason. It is only unconstitutional if it is done for an invidious reason and therefore prohibited. Proof is required to show that invidious reason. The norm is selective prosecution unless there's some invidious reason for the prosecution. Are you asking that we return it to the Circuit Court for further hearing in that regard? Or are you requesting that we reverse this period? We're requesting that you reverse this period. And the reason for that is that there are two elements to a selective prosecution defense. They needed evidence on both. And even if the Circuit Court found that there was a dispute of fact on whether the CPD intended to arrest them because of their message, which we dispute, but even if there was some question of fact on that element, they needed evidence to support that someone was similarly situated to them who was treated better than they were. Now, they didn't actually put in evidence of anyone similarly situated. And the cases require someone to be similarly situated in all material respects. They point to the Obama rally, but there are just a number of differences between that rally and what happened with the Occupy rallies. Moreover, there's not evidence that anyone at the Obama rally did something comparable to these defendants. These defendants say, well, the Obama rally was in the park after 11 o'clock, too. That's not the relevant time period, because there were Occupy protesters in the park after 11 as well. Between 11 and 1, the CPD did not enforce the ordinance on these two occasions. Instead, it allowed everyone who agreed to comply and conformed their conduct to the law to leave the park and continue their protest. Plainly, those people have the same exact message as these defendants. But yet, CPD did not arrest them. Instead, it allowed them to continue protesting. It was only when these defendants made plain that they were not going to comply with the law that they were arrested. The Supreme Court decision in Wait makes clear that when you essentially announce that you are not going to comply with the law, you have selected yourself for prosecution, and it is not unconstitutional to prosecute you. In that case, it involved people who announced they weren't going to comply with the selection. They had already given their collective service requirements, and they said it was because of their message that they were announcing, because they had announced they weren't going to comply, and the Supreme Court said no. They can be prosecuted because of their conduct in refusing to comply with the law after being repeatedly warned. So there was not one bit of evidence that anyone from the Obama rally was in the park after 1 but allowed to stay there. There was at best a YouTube video that showed Obama people in the park at 1123. So they needed evidence on that prong, so that's why we say even if there is any kind of dispute of fact, they needed proof on all of it, otherwise their selective enforcement defense should have not been granted. The motion to dismiss should have been denied. Are you then saying that if it is remanded, they should be allowed to present that as an affirmative defense to the Supreme Court? No, Your Honor, because they had to show if they had this defense, they had their opportunity in their motion to dismiss to come forward with evidence on their selective prosecution claim on the similarly situated prong, and on whether there was evidence about CPD intent. So you're saying that's raised judicata? No, not raised judicata, but that was their... If we rule that the court was wrong in granting it, are you saying that they then would be precluded from raising it on a remand? No, we're saying that they should be, because they had their chance to come forward with evidence that someone who was similarly situated and they didn't do it. Now, whether there's a dispute on the intent issue, that's a separate issue, but even that, there's evidence, there's no proper inference to be drawn that CPD intended to arrest them because of their message, and the reason for that is because there were hundreds of people with the exact same message that they have who were allowed to leave the park and continue their protest when they finally complied with the law. You rely on Clark v. CCNV, and defendants point out that there's a difference in that the Supreme Court did not ban or uphold a ban on the time restrictions. In fact, there was comment that the protesters on homelessness could continue their expression all day, all night. Yes, Your Honor, that just shows that that was a manner restriction and not a time restriction. And the Supreme Court in Clark does not hold that only manner restrictions are appropriate. It does pertain to camping. It didn't pertain to the hours that camping could be, you know, that was allowed. But it does not mean that there is no permissible time restriction. In fact, the Supreme Court in Clark suggested that perhaps a time restriction would have been a better idea, that perhaps 24-hour vigils should have been prevented altogether, which would have been less clumsy, according to the Court. So that strongly suggests that time restrictions are constitutional as well, and maybe even preferable in that context. But time, place, and manner, you can choose time, place, or manner. You don't have to only choose one or the other. Unless there are further questions, I want to reserve my remaining time for rebuttal. Thank you. The appellee. May it please the Court. John Klein for the Durkin defendants. I'd like to start by making sure we all understand the place we're talking about here. The references in the brief and in the arguments so far have been to Grant Park. And that conjures a picture of enormous green areas, obscure locations, places that are hidden from the public view. What we're really talking about here is a place called Congress Plaza. It's bordered by Congress Parkway on one side, by Michigan Avenue on another. There's a paved road that runs around right behind it. And it is mostly paved itself. There's a small grassy area, there's a statue of a horse, but it's mostly paved. It is a highly visible area. It is an area where anybody passing by, either on the road or on the sidewalk, can see. Anybody on the road, on Congress, or on Michigan, or on the sidewalk in front or on the other side can hear what's being said and can see what's being said. It's also an area that, in terms of public safety, is indistinguishable from the streets surrounding it. The notion that closing that area is essential or necessary for public safety is, if you think about the area we're talking about, it doesn't make much sense. Again, if we were talking about a deep recess of Grant Park, that argument might have a little more traction, but we're not. We're talking about an area that is as public and as easily accessible to passersby, as visible to passersby, as the sidewalk itself. The advantage that it has for people like the Occupy demonstrators is, number one, it is a large paved area that is off the sidewalk, so it's not interfering with pedestrians. It is an area where people can congregate, can speak to each other, can interact. And it's an area where people can, if they want to set up small structures, if they want to speak, have public speaking ability, they can do that. The sidewalk, and I'll get to the ample alternatives in a second, the sidewalks crowded with people, narrow, are hardly an adequate substitute. And in fact, you really have to wonder what the city is thinking and suggesting that hundreds of people, because there was actually, I think, 173 people one night who were arrested in the park, 130 another night. And the only reason the numbers were so small is that some people had given up their First Amendment rights to leave the park when they were warned by the police. So it would have been even more had the police not warned people to leave the park. The notion that the city would prefer to have that enormous throng of people on the sidewalk adjacent to the road, where pedestrians are having to move out into the street, where there's a risk of people getting knocked in front of cars, that that would be a preferable alternative, even from the city's perspective, doesn't make any sense at all. Well, in fairness, the area you're talking about has traffic running alongside it equally. You have the Congress Expressway east and west, you have Michigan Avenue north and south, you have a turnaround right there, you have ingress and egress off of Lakeshore Drive, whether you're on the east side of Michigan Avenue or the west side of Michigan Avenue, there's a lot of traffic there. There is, and, Your Honor, that's what makes this both an ideal spot for public political speech, which this was, and also a place with a very low risk of crime occurring. Isn't that true on the west side of the street? Because you're just walking across Michigan Avenue from the east side to the west side. Well, on the Roosevelt University side of the street, it's just a sidewalk. That's the problem. There's no park over there. On the side of the street where the Occupy people were, it's not just a sidewalk, although there is that, too. You know, we all were born and raised in Chicago and have been there a number of times. Let me ask you, are you in agreement that there's not a facial challenge here? No. I think there is a facial challenge, although I also think that trying to parse the difference between facial and as applied under these circumstances, it isn't worth the effort. I think it comes to the same thing. I'll briefly explain. Well, yeah, please. A facial challenge is typically made in two circumstances. It's uniquely important in two circumstances. One is over breadth, where the person bringing the challenge does not have his own or her own conduct threatened or speech threatened, but wants to speak on behalf of other people. That's not this case. Clearly, the Occupy demonstrators are engaged in speech and expressive conduct. The city concedes that. Let's talk about the ordinance. Sure. The ordinance on its face, are you saying it is unconstitutional? I believe it is, yes. In what manner? It is an unconstitutional time, place, and manner restriction. It is content neutral. There's no dispute about that. It is a time, place, and manner restriction. It has to be analyzed, as the city council said under the ward rubric. What's unreasonable about closing Chicago parks from 11 o'clock at night until 6 in the morning? There are two problems with it, and I'm going to speak in the language of the First Amendment case. The key problem is with the city's argument. There are two words that the city doesn't focus on, and I want to emphasize them. One word is narrowly. It has to be narrowly tailored, not just have some reasonable relation, which is your Honor's question sort of suggests the terms you're thinking in. It's got to be narrowly tailored. That doesn't mean least restrictive alternative, but it does mean narrowly tailored. The other requirement, and this is the other word where I think the city falls apart, is ample. There have to be ample alternatives, not just some hypothetical alternative. There have to be ample alternatives. And if you're thinking about what this demonstration was about, it is people who are part of their message. A key part of their message is to occupy, to be present on public property. Part of their message is being there full time. Part of their message is speaking to each other and to other people about the things that they believe in. Those are all key aspects of their speech. And if you think about that speech, and you think about what's needed to have that speech, I don't think you can find that this ordinance is narrowly tailored to serve a substantial government interest. And the circuit court, Judge Donnelly, found that for several reasons. And I'll add another one. Here's what I'm struggling with. You have an ordinance that is content neutral. All Chicago parks are closed from 11 p.m. to 6 a.m. Every one of them. What's wrong with that? Now, it may not suit your purpose, but Chicago City Hall, the Daily Center, this building, are closed during certain hours. Now, it may serve your purpose, your client's purpose, accurately, to protest in this building at 11 o'clock at night. Does that mean we can't close this building at 11 o'clock because some group wants to protest at 11 o'clock at night? Because they feel it's most effective to do it at that time? And not 10 o'clock in the morning? I think a critical difference is that the park is a public forum. It is a traditional place where speech can be made. I don't think this building would be considered a public forum or City Hall. How about the courthouse? I don't think it would be. The parks are the quintessential public forum. They're the place where people go to speak. They're the place where people go. And certainly Grant Park has a long history of that, as Judge Donnelly noted. So you've asked me what's wrong with this ordinance. And I'll give you sort of a legal answer, and then I'll give you a slightly different answer. It is not narrowly tailored to serve the substantial government interest. And we don't dispute that keeping the parks clean and safe and all that, those are substantial interests. But this is not narrowly tailored to achieve it. Nor are there ample alternatives for the speech that was at issue here. Would it be narrowly tailored if the park was open until 2 in the morning, closed at 2 in the morning, and reopened at 3 in the morning? Well, I've thought about a lot of hypotheticals like that. And here's what I would say. I don't think there's a bright line in terms of the number of hours. So you want all or nothing? You want it all, 24 hours a day? Our argument is that closure impermissibly burdens the First Amendment. But I will say that if this were a one-hour closure, let's say, we'd have a much harder case. Then I think the argument that there's ample alternative for them, that this is narrowly tailored, would have a lot more credibility. But let me give you a different hypothetical. Suppose that the parks were closed 23 hours a day for safety and maintenance and cleanliness. I don't think anybody in this courtroom would be defending the constitutionality of that ordinance. Because it clearly would not be narrowly tailored. And there wouldn't be ample alternatives. So there's a line to be drawn there. So allowing 7 hours for the city to do its maintenance, whatever, that's unreasonable? It is unreasonable if it is not narrowly tailored. The standard is not reasonableness. It is narrow tailoring. And it is ample alternatives. And this 7-hour closure flunks both of those tests. Well, when you're deciding, you know, what is... Impliedly, you have to use a reasonable standard. Let me approach it a different way. I respectfully disagree that that is a standard, because I think that then invites a sort of weakening of the First Amendment protections. The reason those standards are so strict, narrow tailoring, ample alternatives, is because we're talking about very important constitutional rights. And if you start talking in terms of reasonableness, I believe that considerably weakens the protections that those rights are supposed to have. But let me approach it in a slightly different way, too. The cases are quite clear that where there is a time, place, or manner restriction that burdens speech, and we clearly have that here. The burden is on the government, whether that's a city or a state or the federal government, to show narrow tailoring and to show ample alternatives. They have the burden. And the reason they have the burden is, and I think the Harina case from the Seventh Circuit talks about this, the Weinberg case talks about this, they have the burden, again, because these First Amendment rights are so important, they don't want judges or officials relying on speculation or sort of a general sense of things to uphold regulations that have this sort of impact. And so you have to ask yourself, has the city met its burden here? And the only thing the city submitted to meet this burden is the Alonzo Williams affidavit. And if you read that affidavit, Judge Donnelly did not give it any weight to speak of, and he was absolutely correct in that, because it is conclusory, it merely asserts, Your Honor asked what Mr. Williams says about safety. Well, he says, all he says about safety, it's one sentence. He says, further, limited access by pedestrians during park closure hours reduces crime against park patrons and park property. That's all he says. Do you dispute that? I certainly dispute it with respect to the area we're talking about. Well, how can you limit this case to the area you're talking about when it's a park district-wide ordinance? We have parks throughout the city of Chicago that if the ordinance were changed would require at least security patrols during the open hours of all the parks. Are you suggesting that they should have a different ordinance for that location as opposed to all other parks in the city? That's certainly an option. If we're talking about a narrowly tailored restriction... Is that a practical option? I mean, having now seen the place, which I hadn't before because I'm not a Chicagoan, I think it's absolutely a practical option. I confessed until I saw the place it hadn't occurred to me. But yes, I do believe that's a practical option. But the other thing, apart from the threadbareness of the Williams Affidavit, you look at other parks around the country. Well, you know, just thinking about what you just said, if the city said that we will have an ordinance that allows the park at 63rd and State to be open 24 hours a day, occupy, feel free to go down there and occupy it 24 hours a day for three months, that's an alternative. It wouldn't have been Michigan Avenue. It's not an ample alternative, but it is an alternative. By whose standards? Your Honors are the ones who ultimately decide that question, whether any alternative is ample. But the sidewalks were certainly not an ample alternative. We're not here on the sidewalks, we're here on the park district. Oh, you're saying the sidewalks on Michigan Avenue? Yes, yes, yes. Not LaSalle and Jax? No, no. And 17 hours a day when we're talking about a full-time occupation is not an adequate alternative, especially for people, and the affidavits say this, who have day jobs, who can't be there. Mr. Kline, was there any counter-affidavits to refute Mr. Williams' testimony? Well, I would say that not directly refuting, but yes in the sense that all the affidavits, for example, I believe all, from the Occupy people talked about they were keeping the parks clean. They were interacting regularly with the police to make sure that they were not causing a problem. But that's not a statement refuting the purpose of the ordinance and the needs of the government, correct? That's just sort of the statement that they are complying or voluntarily trying to keep the parks in good shape. There's not a statement from a park expert saying that this is unnecessary, that's correct. So you don't think there was any overreaching when there was no counter-affidavit to Mr. Williams' affidavit for the court to make a conclusion contrary to the affidavit? I think Judge Donnelly was well within his rights to say that this is a conclusory non-fact-based declaration that does not support the city's burden. And the Weinberg case is the case that I would cite most directly on point, which rejects a very similar affidavit. I've used more than my time, so I'm going to... Yes, there has been 15 minutes. Thank you, sir. 15 minutes. May it please the court. Thank you. I'd like to just kind of step in on the point that you are discussing here about the interest raised by the city in order to attempt to justify the application of the ordinance in this case. And again, I'm going to again refer you to Weinberg as co-counsel did, because although Weinberg is a Seventh Circuit case, it is directly on point to this case. It is interpreting Illinois law and in fact an ordinance law. And what that case stands for is that it is not sufficient to simply state that there are sufficient interests. We are not in this case contesting that the city of Chicago has an interest in the beautification of the parks or maintaining a safe park environment. That's not the issue, but what we are contesting is that the city has sufficiently shown through their Alonzo Affidavit, which is the only proof that they've set forth, that those interests are implicated in this set of facts. That they have failed to show that the Occupy Chicago demonstrators on these two nights in October in 2011 were in any way interfering with their ability to keep Grant Park clean or safe or maintained. They didn't put forth any evidence of any cleaning schedules or construction that had been postponed that day or anything of the like, which is what Judge Donnelly relied on when he found that the ordinance was not narrowly tailored in this case and its application to these defendants in Grant Park. What would satisfy your defendants that there's proof of more violent crime between the hours of 11 and 6 on public property? To be clear, we're making an as-applied challenge so we are saying that we're not raising a challenge but with respect to the deficiency you're claiming in Mr. Williams' affidavit. What is your, I guess, contention that what would have sufficed as evidence to establish their interest, that it's a legitimate interest? Sure, that there is some kind of interference with the interests that the city set forth. That somehow, and this is what the Seventh Circuit has found in Weinberg, that somehow those interests that they set forth are actually implicated are actually at risk. That's what I mean. Do you need crime stats? Do you need empirical data to show these incidences always have a higher percentage of occurring between the hours of 11 and 6? Sure, I understand. I think I understand. No, Your Honor, what I think would suffice in this case was, for example, some evidence that this area of Grant Park at the horse statue was scheduled to be maintained that night. That there was some kind of beautification or planting that was to be done that night or construction on the concrete area. Something of that sort. That the demonstrators actually interfered with the city's ability, in this case, to keep the park clean. Remember, Judge, what we're talking about here is a Park District Ordinance a curfew, essentially, next to the First Amendment of the Constitution. Our position is that it is insufficient for the city to simply say, because we've decided that we need to close all the parks for this number of hours a day, you have no First Amendment right to be here, this moment, in this time. And that's the only thing we're contesting in this case. And it was their burden, and this is very clear in the case law, to set forth some evidence, some real evidence that there was an actual interference with their substantial rights, their significant interests. And they have failed to do that. And it's important to note that they had ample opportunity in the lower court to provide counter-affidavits to the affidavits which we provided in order to address the interests, in order to address the deficiencies. You didn't raise the affidavits until your reply, right? In the lower court. Did you bring it up on your motion, or did you bring it up on your reply? No, we filed a motion to dismiss believing that we were in the criminal courts according to the way that the case had been prosecuted up to that point. Okay, so when did you file your counter-affidavits for the first time, then? We filed affidavits with the reply, which I address as not the customary 2619 procedure. However, because Judge Donnelly and the parties agreed that it was more important to proceed on the substance of the claims and not to get caught up in the procedure, we offered several times, and the judge then also offered the city several opportunities to have a sur-reply and to file responsive affidavits because we wanted to deal with the real issues. And we were certainly willing to allow them the opportunity to respond to our affidavits. And this was actually on two separate hearing dates. They were granted the opportunity by the judge to file responsive affidavits and may flatly refuse both times. So at this point, any kind of argument that they didn't have the opportunity to put forth the evidence necessary to sustain their First Amendment burden is a red herring. They had that opportunity. They chose against it. And so that's why we are here. So the city has failed to show the narrow tailoring of this because they have failed to show any nexus at all between the interests that they claim are substantial and the application of the ordinance to these defendants, the Occupy Chicago protesters in that area. I do want to address for a moment the ample alternatives argument. The city keeps saying ample alternatives. That's not the full test, right? The real test is ample adequate alternatives. In this case, there were none available to the Occupy Chicago demonstrators those two nights in Chicago. And in order to truly evaluate that, I think it's important to discuss for a moment what the speech here is, what it was that Occupy Chicago was doing both those nights in Grant Park. And it's important to know that the occupation of the physical space was not only a method or a platform for speech, it was also the speech itself. And what I mean when I say that is it was a platform for speech because within the occupation, within holding a physical public space, that allowed the space for the traditional First Amendment-protected activity. The leafleting, the picketing, the speeches, the teach-ins, things that we wouldn't question, right? Our First Amendment-protected activity. And so that physical space is where those other types of First Amendment activity could proceed. But also the occupation itself, that 24-hour physical presence was an important speech itself. And it was important because the Occupy Chicago movement was taking a stand against economic inequality in this country. It was taking a stand against the corporate, the emphasis on the corporate speech and the power given to corporate speakers in this country. Now they don't have money to go buy an ad at the Super Bowl, right? They don't have money to illuminate a building with a 24-hour big blue sign with its insignia like the Chase Building, which is illuminated all night long. The only way for Occupy Chicago to reclaim their right to speech and to emphasize that we the people have the right to 24-hour speech and it is just as important, if not more important, than the corporate speech is to reclaim that space and to have a 24-hour presence on the street. And in doing that and showing that the message was so important that they would sacrifice their own personal safety, there was value to that. There was coming to a point in this movement in Occupy Chicago when Jackson and LaSalle was no longer sufficient and that's why the city puts forth two potential alternatives for the ample alternatives for that night, Jackson and LaSalle or the streets outside of Michigan and Congress. They're both absolutely inadequate. Jackson and LaSalle is inadequate for a number of reasons. One is the movement was growing as is evidenced in the affidavits which we set forth and they were all growing that space. Second of all, which is certainly set forth in the affidavits, is the city was effectively in the process of shutting down Jackson and LaSalle as an adequate alternative for Occupy Chicago through their increasingly draconian rules and regulations which despite Occupy Chicago doing everything to comply with the city was playing games with them essentially. Changing the rules one day, Occupy would do their best to comply, changing the rules the next day, making it more and more of a hostile environment there. In the mind of the speaker, which is what the Supreme Court tells us we have to look to to determine what's an ample alternative, the Occupy Chicago demonstrators did not believe that Jackson and LaSalle was an ample alternative for them to continue their speech. Is that a totally subjective standard? It's the mind of the occupier and not the mind of the other people in the city? None of the other ordinances or restrictions that you just mentioned they're not at issue in this case. The only thing at issue in this case is the Park District's 11-6 closure, correct? Justice, excuse me, I'm not sure if I understand entirely what you mean. I'm not referring to other ordinances necessarily that the city could have enforced. You were complaining that they kept changing the rules. The only rule you're contesting is the ordinance of 11-6. Correct. What I'm saying though is that because the police had been systematically making it more and more difficult to engage in any kind of First Amendment speech activity particularly occupation at Jackson and LaSalle that that was no longer an adequate or ample alternative for the speakers for Occupy Chicago demonstrators. Was that because it was getting larger and it was creating more of a traffic problem? An ingress and egress problem? A safety problem perhaps? A security problem perhaps? More people, more security, more traffic? This is Chicago. There's 2.5 million people that transverse these streets every day. Is Occupy entitled to just do whatever they want? Well Judge, what we are saying is that force of habit is very difficult to change. The facts in the record in the affidavit are that Occupy Chicago began at Jackson and LaSalle. Another important point I do want to raise is that Grant Park and Jackson and LaSalle were equally important to the Occupy Chicago movement. They were both part of their daily speech. They had a presence at Jackson and LaSalle. Every single day, Occupy Chicago would march to this exact location at Grant Park at the horse statue and engage in their democratic process, the General Assembly, so they're certainly tethered to both locations. But the affidavit showed and they would move and come back the next day. Yes, they would go back and forth. They decided 303 people decided that they would get arrested when asked to leave. Well, they were given, they unfortunately were put in the untenable position of having to choose between exercising their First Amendment rights or being arrested those nights in Chicago. Correct. What is in the affidavits in the record is that at Jackson and LaSalle, the Occupy Chicago demonstrators did absolutely everything within their power to cooperate with the police in order to ensure that they were not causing a problem with traffic or making it difficult for pedestrians to get through. Occupy Chicago considered themselves to be a movement of the people and for the people, and that includes the people of the city of Chicago. In fact, many people throughout the day would come and join them. There was no interest in making an unsafe or unsecure or unpleasant environment at Jackson and LaSalle for anyone. So they made every effort to coordinate with the police. But the police... Your Honor, there comes a point... To the west side of Michigan Avenue? In order to move to the west side of Michigan Avenue, they would have had to... There was no space in the sidewalks of Michigan Avenue to engage in an occupation, which again, it was changing the nature of the speech to ask the demonstrators to move across the street. They would have been allowed to be across the street on the sidewalk. This is like in front of Roosevelt University? Yes. It's a rather wide sidewalk, isn't it? Well, to put hundreds of people on the sidewalk, which means they would have to be long and lean, right? Between Congress and, what is it, Jackson, Adams, whatever? Right. It totally denigrates their speech. There's nothing stopping them from being all the way from Congress all the way to the Chicago River? There's nothing in the record that we know of, Judge? Well, we all know the city. We know the city. Well, geographically, no, there's nothing. But I mean in terms of police enforcement, of other ordinances, and if they would have facilitated the speech, which is their duty to do. Putting hundreds of demonstrators just jammed along a sidewalk takes away from their message because it prevents them from being able to occupy. It prevents them from being able to counter this 24-hour speech. And it also, I think most importantly, prevents them from even being able to talk to each other. There's no freedom to be able to... How is the physical occupation different if it's oblong-shaped versus a dense mass in the park? It's not the same as the D.C. case where the tents, right, the tent itself is the speech because it's about homelessness. Here, it's about occupying Chicago and having the right to have the physical space. How is this physical space, how's the message different just because of the maybe shape of the occupation? It takes away from the demonstrators' ability to communicate with each other because they're all at different ends. But they're not trying to communicate with each other, are they? Aren't you trying to message to everybody else? The 1%? You had your human microphones. Yes, they did, and those were very effective. I don't know if you ever participated in one. But having to do that from one side to the other means that they can't actually have any kind of community in terms of determining how to proceed with that demonstration. And the democratic decision making of Occupy Chicago was essential to their message and the fact that they did that publicly was essential. The other point to this is also that it wasn't just the speaking to the 1% or to other 99%ers, right? This is why it's both the platform and the speech itself. Within the occupation, protected speech activities were occurring constantly and that is an essential part of this. There was a bringing together of people from different backgrounds in order to discuss and strategize about the economic system and about how to take back the power. And in order to do that, they had to be able to communicate. And that's why the space was so perfect for General Assemblies and why they marched there that night and I believe why the police directed them there to begin with was because they could have a very effective communal space to communicate, to use the human microphone to have their governing, which is the General Assemblies there in the corner. Excuse me for interrupting. Your time has concluded. Thank you. Your Honors, in this case the speech that we're talking about is the most fundamentally protected speech and as the Supreme Court tells us that holds a space at the top of the hierarchy of the First Amendment jurisprudence. Not only that, we're in the public fora, the most guarded of locations in this country in order to exercise your First Amendment rights. And the city has utterly failed to show that any of the interests that they set forth were implicated in this case are narrowly tailored or that there were adequate and ample alternatives for these speakers to continue their First Amendment speech. Thank you. We ask that you uphold the Circuit Court. Thank you. Thank you. Appellant. Six minutes. I'll be brief. Take all six. Defendants really misunderstand the applicable legal standards. They want to focus on their own conduct and the particular night in question on the narrow tailoring prong and it's not just about what they would have preferred to do and the manner in which they would have preferred to do it because intermediate scrutiny allows the government it requires looking at not just the effect of the particular conduct but on everyone who would be entitled to avoid the regulation and I want to just read this from Clark. It is evident from our cases that the validity of this regulation need not be judged solely by reference to the demonstration at hand. Absent the prohibition, there would be other groups who would demand permission to deliver an asserted message by camping in Lafayette Park. Some of them would surely have as credible a claim and therefore the question is not whether those particular defendants would have harmed the concrete or whether they would have been impeding the interest in overnight crime. It's about whether everyone who could avoid the regulation who is in a similar position would impede the governmental interest and it's not an acceptable answer to say we could have done it differently because the question is whether this, the way we did do it, is acceptable and that question requires looking at whether substantially more speech than necessary has been impacted and it simply cannot be held that substantially more speech than necessary is impacted by closing the parks in the middle of the night. These defendants wanted to occupy in the middle of the night. If a different exception were made, different people would have a claim that their message depends on an exception to that particular regulation. That's why the government can choose a different way of going about it and it's not just a focus of what these particular defendants want. The First Amendment does not require the Chicago to allow occupation of the parks in the middle of the night. The same with respect to the ample alternatives. The case law makes clear that it doesn't have to be the speaker's first choice or their preferred way of doing it. There wouldn't be a question about ample alternatives if it always had to be the way they wanted to do it. Obviously it's not the way they want to do it otherwise there wouldn't be cases about this. The speakers don't have to have their first choice. It doesn't even have to require reaching the same audience and it doesn't have to actually require them to express themselves in the same way. We cite cases in our briefs that uphold different ways. So there was 24-hour expression available to these defendants outside the city's parks. They could have gone across the street onto the sidewalks. It's strange credulity to claim that 90 people could not have fit on the sidewalks of the city of Chicago. This is also 1 o'clock in the middle of the night. So these people, there was other places they could have gone. We expressed the plazas of the city are available. We also explained that they could have gone back to Jackson and LaSalle. Finally, I just wanted to discuss a couple of the miscellaneous issues that they raised. One, the facial challenge came up and I just want to express that a facial invalidation of an ordinance, the test would be whether every conceivable application of the ordinance violates the First Amendment. And it simply cannot be said that there's just no First Amendment right to be in the park to play soccer, to picnic, to deal drugs, to roller blade. There are just numerous reasons people go to the park that are not there to express themselves and it does not violate the First Amendment to close the park to those people. So it cannot be the case that this ordinance is unconstitutional in every application and the defendants have conceded they're not bringing a substantial overbreath challenge. So the facial invalidation should be reversed. And then on the burden of proof point, again, the procedural posture of this is that defendants have the obligation to come forward with affidavits to support their affirmative defense. Then the city met its burden when we came forward with our affidavit from the park district official and these are legal issues that require common sense. Narrow tailoring and ample alternatives and our affidavit supported that we have these interests and that these interests were served by the regulation. The court is not required to take evidence on whether in the middle of the night parks are dangerous. It can use the common sense and we cite cases in our brief in which court did use common sense and said it doesn't take a lot for us to believe that the parks are more dangerous than the sidewalks in the middle of the night and that was a different Occupy case. So we satisfied our burden of proof. Weinberg, which they rely on, was a summary judgment case. This is a motion to dismiss. Unless there are other questions? We respectfully ask the court to reverse the judgment. I have just one question that's been sort of banging around in my brain. There were 303 people arrested at Grant Park on these two nights and there's 92 defendants that were consolidated? Yes. So we're only dealing with 92 cases here that were consolidated? Yes, correct, Your Honor. Not everyone who was arrested went on to challenge the motion to dismiss. In light of the fact that the ordinance is narrowly tailored and that there are ample alternatives for these 90 people, the circuit court should not have held that this regulation violated the First Amendment rights as applied. Moreover, defendants didn't even challenge the selective enforcement defense was improperly ruled on below. We submit that that should also be reversed. We ask the court to remand. Thank you, Your Honor. Thank you to the parties for your excellent briefing. Thank you for your excellent oral arguments. The court is taking this matter under advisement. Court is adjourned.